IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PHILLIP G. CLINE,

                Plaintiff,

                                 CIVIL ACTION
      vs.                             No. 03-2655-GTV

SOUTHERN STAR CENTRAL
GAS PIPELINE, INC., formerly
WILLIAMS GAS PIPELINES
SOUTHCENTRAL, INC.,

                Defendant.

## MEMORANDUM AND ORDER

      Plaintiff Phillip G. Cline brings this action pursuant to the court's diversity jurisdiction, 28 U.S.C. § 1332, against Defendant Southern Star Central Gas Pipeline, Inc. ("Southern Star"), formerly Williams Gas Pipelines Southcentral, Inc.   Plaintiff's claims relate to his efforts over the past twenty-six years to obtain free gas from Defendant and its predecessors pursuant to a gas storage lease and an acknowledgment of payment agreement.   Specifically, Plaintiff alleges that Defendant: breached an agreement to provide him free gas for domestic purposes; prevented him from receiving free gas based on fraudulent reasons; converted natural gas produced by the petroleum deposits underneath his property; and intentionally inflicted emotional distress on him, aggravating his preexisting post-traumatic stress disorder.

      Defendant denies Plaintiff's allegations and asserts two counterclaims.   First, Defendant

requests a judgment quieting title to the following: all natural gas it injected underneath Plaintiff's property; any other natural gas, oil or other minerals under specified areas of Plaintiff's property; and any wells, pipelines or other property it has placed on Plaintiff's property.  Second, Defendant requests a declaratory judgment stating that its gas storage lease remains valid and that it has not breached its agreement to provide free gas to Plaintiff.  Defendant also asks the court to declare the terms and conditions Plaintiff must satisfy in order to receive free gas in the future.

This action is before the court on Defendant's motion for summary judgment (Doc. 46). For the following reasons, Defendant's motion is granted in part and denied in part.  The court grants Defendant summary judgment as to all of Plaintiff's claims and as well as its own declaratory judgment counterclaim, but denies Defendant summary judgment on its quiet title counterclaim.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. <u>Anderson</u>, 477 U.S. at 256. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. <u>Id.</u> The court must consider the record in the light most favorable to the nonmoving party. <u>Bee v. Greaves</u>, 744 F.2d 1387, 1396 (10th Cir. 1984).

As an initial matter, the court observes that Plaintiff's response to Defendant's motion for summary judgment failed to comply with D. Kan. Rule 56.1. Defendant's motion for summary judgment contained forty-two numbered statements of material fact citing specific portions of the summary judgment record upon which it relied. <u>See</u> D. Kan. Rule 56.1(a). In response, Plaintiff filed twenty separately numbered statements of material fact of his own, addressing only one of Defendant's statements of fact by number. Moreover, most of Plaintiff's statements of fact refer the court to the pre-trial order for support, or cite to a deposition without providing a page or line reference. <u>See</u> D. Kan. Rule 56.1(b)(1) ("Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed."). Accordingly, those facts not properly controverted by Plaintiff are deemed admitted for the purposes of Defendant's

summary judgment motion.

## II.  FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in a light most favorable to Plaintiff's case.  Immaterial facts and facts not properly supported by the record are omitted.  When necessary, additional facts are included in the discussion section of this memorandum and order.

### A.  The Parties

Phillip Cline is a landowner within the boundaries of an underground natural gas storage field located in Jefferson County, Kansas ("the McLouth Storage Field").  Southern Star is an interstate natural gas pipeline company that owns the McLouth Storage Field.

Mr. Cline began living on the property at issue in 1978.[1]  At the time he acquired the property, it was subject to an Oil and Gas Lease, a Gas Storage Lease, and an Acknowledgment of Payment, all of which Mr. Cline's predecessor and Southern Star's predecessor executed on June 16, 1951.  Southern Star is the current owner of the gas storage and oil and gas interests at issue in this case, as it is the successor-in-interest to Williams Gas Pipeline Southcentral, Inc. ("Williams Gas"), Williams Natural Gas Company ("Williams Natural"), and Cities Service Gas Company ("Cities Service").

---

[1]    Mr. Cline testified in deposition that he purchased the property in 1976 or 1977, but the deed to the property was signed and recorded in February 1984.

## B.  The Contracts

### 1.  Oil and Gas Lease[2]

The Oil and Gas Lease granted Southern Star and its predecessors the exclusive right on Mr. Cline's property to carry "on geological, geophysical and other exploratory work, including core drilling, and the drilling, mining and operating for, producing, and saving all of the oil, gas, casinghead gas, casinghead gasoline and all other gases and their respective constituent vapors . . . ."  The Oil and Gas Lease was for a primary term of  ten years, and so long thereafter "as oil, gas, casinghead gas, casinghead gasoline or any of the products covered by . . . [the] lease is or can be produced."

### 2.  Gas Storage Lease

The Gas Storage Lease granted Southern Star and its predecessors the exclusive right to use Mr. Cline's property to introduce, store, and remove gas from specified sands and formations below the surface of his property.  The lessor possesses all oil rights below the surface and all gas rights found below the designated sands and formations, but the lessor must protect the storage formations if the lessor pursues development of those reserved rights.  The Gas Storage Lease was for a primary term of ten years, and so long thereafter as the lessee used the designated sands and formations for gas storage purposes.  Moreover, the lessee may continue the lease from year to year by making annual rental payments to the lessor.  Other provisions of the Gas Storage Lease

---

[2]      The information discussed about the Oil and Gas Lease comes from Defendant's motion for summary judgment and is not controverted by Plaintiff.  The court, however, could not read the copy of the Oil and Gas Lease provided by the parties because the size of the print was too small and otherwise illegible.

relevant to this action state:

> 7.   There now exists on the land described in this lease no producing gas well and for the purpose of this contract the parties have taken measures to ascertain and calculate the amount of gas underlying the premises involved and do hereby agree that there was on June 23, 1944 no cubic feet there . . . .

> . . . .

> 14.   It is mutually understood that production under an oil and gas lease and storage and extraction of storage gas under a storage lease cannot be successfully carried on from the same sands at the same time and it is agreed that at any time when this storage lease is in good standing by reason of rental payments any valid oil or gas lease now upon said lands shall not be subject to attack on the ground of lack of production or of proper development as to the sands and depths involved herein but that proper operations under this lease or under such oil and gas lease shall keep such oil and gas lease in good standing and prevent lapse, abandonment charge or forfeiture.

> 14A.   It is mutually understood that payment of rentals under this lease shall relieve the Lessee of paying rentals under the oil and gas lease.

It is uncontroverted that Southern Star and its predecessors have tendered all annual rental payments owed under the Gas Storage Lease and that Southern Star is currently storing gas and conducting gas storage operations underneath Mr. Cline's property.

### 3.   Acknowledgment of Payment

The Acknowledgment of Payment ("the Acknowledgment") was executed to compensate Mr. Cline's predecessor for prematurely ending the production of a well that was drilled on the property pursuant to the Oil and Gas Lease.   The recitals section states that the owner of the well intended to abandon and plug the well in the near future because it only produced a small amount of oil, but that Cities Service, Southern Star's predecessor, wanted the well to cease production before it began storing gas under the Gas Storage Lease.   Thus, as consideration for ceasing

production of the well, Cities Service agreed to provide a certain amount of "free gas."   The

Acknowledgment provides, in pertinent part, that

> upon written request . . . , [Cities Service] . . . will furnish gas, free of cost, in an
> amount not to exceed Three Hundred Thousand cubic feet annually, . . . for the
> domestic requirements for each of three (3) principal dwelling houses . . . ."[3]   This
> obligation to furnish gas shall terminate with the termination of the gas storage
> lease hereinabove referred to.   If during the term of the said gas storage lease the
> undersigned or their [a]ssignee uses in any year an amount of gas in excess of Three
> Hundred Thousand cubic feet in any one of the principal dwelling houses above
> referred to, they shall pay . . . fifty cents . . . per thousand cubic feet for such excess
> gas.   *Measurement and delivery of gas shall be at Cities Service Gas Company's
> meter, calculated according to the regular measuring and accounting procedure
> and rules and regulations of Cities Service Gas Company pertaining to the sale
> of gas.*
>
> . . . .
>
> It is specifically understood and agreed that the covenants to furnish gas herein
> contained are in lieu of and substituted for any provisions to so furnish gas
> contained in the gas storage lease hereinabove mentioned, and that upon the
> execution of this agreement, such provision in the gas storage lease shall be null and
> void.
>
> It is further understood and agreed that Cities Service Gas Company shall have the
> option of delivering the gas herein provided either from its nearest pipe line within
> the area of the premises hereinabove described or from a well or wells located on
> said premises.   The point of delivery for such gas shall be at the pipe line of Cities
> Service Gas Company or at the mouth of the well upon said premises, as the case
> may be, and *the undersigned or their assigns, shall lay and maintain in good
> condition the necessary service lines and appurtenances to receive and utilize
> the gas so delivered, all at their sole cost, risk and expense*, and that after the gas
> has been delivered at the delivery point herein provided, Cities Service Gas

---

[3]      The Acknowledgment provides a general description of where each of three principal
dwelling houses "shall be constructed."   The record does not indicate whether these three principal
dwelling homes were ever constructed.   Mr. Cline testified in deposition that he would use his free
gas for the trailer he is living in, the new house he is building, as well as his barn and other
outbuildings.

Company shall have no further control over the same or liability thereof.

(emphasis added).   Mr. Cline testified in deposition that he does not have a producing oil or gas well located on, or a pipeline running across, his property.

### C.  Mr. Cline's Requests for Free Gas

On November 27, 1978, Phillip Cline sent a letter to Cities Service.  He wanted to know if it would be possible to tap his neighbor's well and run a line to his farm because Cities Service did not have a gas well on his property.  Cities Service responded on November 30, approving his "request for a mainline domestic gas service connection . . . under our usual terms and conditions." However, Cities Service informed Mr. Cline that federal law required it to first apply for a "Certificate of Public Convenience and Necessity" before commencing service to his property. Cities Service agreed to prepare the application materials and estimated that it could take six months to obtain the Federal Energy Regulatory Commission's approval.  Upon issuance of the certificate, Cities Service stated that it would send Mr. Cline an "Application for Transportation Line Connection" for his signature.  Cities Service also informed Mr. Cline that along with the application, he would be required to pay a $350.00 connection charge fee, $10.50 in state sales tax, and a $10.00 security deposit.

On September 13, 1979, Cities Service reported to Mr. Cline that the Federal Regulatory Commission had approved the certificate authorizing it to make a connection for domestic gas service.  Under the terms of the certificate, Cities Service had a deadline of September 7, 1980 to make the connection or Cities Service would have to refile the application.  Cities Service enclosed two copies of the "Application for Transportation Line Connection" for Mr. Cline's

signature and requested Mr. Cline to include with his returned application a check for $370.50 for the connection charge, sales tax and security deposit. Additionally, Cities Service informed Mr. Cline that it was his responsibility to install the service line from his residence to the connection located at its pipeline. By July 1980, Cities Service had not received an application and check from Mr. Cline, so it notified Mr. Cline that its authorization to install facilities for natural gas delivery expired in two months. On September 9, 1980, Cities Service sent a letter to Mr. Cline, stating that its authorization had expired and that he needed to let Cities Service know if he still desired a natural gas connection to his property so that it could file a new application.

The record is devoid of any further communications until October 1988. At that time, Mr. Cline wrote to Williams Natural, stating in part:

> When I purchased this land I was given permission to connect to a gas line, is this still permissible? I am living in a mobile home and would like to drill a gas well or hook on to the line per our agreement.
> When I was told I could connect to a gas line I did not have the money to do so, but now my finances are such that I can afford to drill a gas well.

Williams Natural responded on November 2, 1988, approving Mr. Cline's request for gas service under its "usual terms and conditions." Williams Natural provided Mr. Cline with two copies of its "Application for Transportation Line Connection" for his signature, and asked that the application be returned with a check for $364.00 for the connection charge and the applicable state sales tax. Because Mr. Cline did not have a well on his land, Williams Natural told Mr. Cline that he would need to construct a service line from his property to its pipeline, at his expense, and to obtain the necessary easements if the service line crossed his neighbor's land.

Mr. Cline did not contact Williams Natural again until November 11, 1991, when he asked

for a copy of the gas storage agreement covering his land.  Williams Natural complied with his request on November 19.  In addition, Williams Natural sent a letter substantially similar to its November 2, 1988 letter to Mr. Cline, outlining what it considered to be Mr. Cline's responsibilities for obtaining gas service, which included a $350.00 connection charge and $18.38 in applicable state and county sales taxes.  Again, Williams Natural provided Mr. Cline with two copies of its connection agreement for his signature.

On April 7, 1992, Mr. Cline wrote to Williams Natural stating that it had "null and voided the original lease agreement," and demanded the company to run a service line from its pipeline to his property at Williams Natural's expense and to forever furnish gas, for any use, to him and his family.  Williams Natural responded on April 20, informing Mr. Cline that he could construct a service line and connect with its pipeline and use gas according to the terms and conditions of the Acknowledgment.

In December 1995, Mr. Cline filed suit against Williams Natural in state court, alleging that it breached the Gas Storage Lease by failing to make rental payments in 1992 and 1993, and by unlawfully storing natural gas under his property since October 1992.  The petition did not make any claim to free gas.  Williams Natural subsequently removed the case to federal court. Eventually, the parties entered a stipulation to dismiss the case with prejudice and stipulated that "all the annual payments due . . . have been made in a timely manner, and that the Lease continues in full force and effect."

On October 2, 1998, Mr. Cline sent Williams Natural a check for $368.38 and a signed Application for Transportation Line Connection that he had received in 1991.  The memo line of

the check states, for "meter hookup."   Williams Gas acknowledged receipt of the "outdated" application and check amount in a letter dated November 4, 1998.   The letter advised Mr. Cline that he still needed to have proper facilities on his property to make a connection, as well as an arrangement with his neighbors to cross their land with a service line.   Furthermore, due to governmental safety regulations, Williams Gas stated that it required third party contractors to construct the service line at the customer's expense, as opposed to allowing homeowners to construct their own service lines as it did in 1991.   As a result of the changes in the costs of making service line connections, Williams Gas stated that it no longer charged a flat fee of $350.00.   Rather, it charged customers "the actual costs of . . . [the] connection and the construction of the service line and metering facilities . . . ."   The letter concluded that if Mr. Cline obtained a right-of-way to connect to its pipeline, he must submit, in advance, an installation deposit charge of $5,000.00 to cover the construction of the metering facilities, service line and connection tap.   If the actual costs fell below five thousand dollars, Mr. Cline would be refunded that amount, but if the actual costs exceeded five thousand dollars, he would be required to pay the additional costs.   Mr. Kline responded on November 15, questioning the actual cost to hook up a service line and requesting a copy of the new contract that required the $5,000.00 fee.

In response to another request by Mr. Cline for a gas connection, Williams Gas informed Mr. Cline on April 4, 2001, that it would install the tap subject to him: receiving permission to set a meter on his neighbor's property; signing an Application for Transportation Contract; paying a tap installation fee of $5,000; and employing a contractor certified by the Department of Transportation to install the service line.   Williams Gas also reiterated to Mr. Cline the amount

of free gas and additional usage rate he was entitled to under the Acknowledgment, and that the free gas could only be used for his principal dwelling house as opposed to his barns.  On July 15, 2002, Williams Gas sent Mr. Cline another copy of the April 2001 letter after Mr. Cline again requested information on installing a gas tap on his property.

Mr. Cline's attorney, Ira Dennis Hawver, contacted Williams Gas on December 10, 2002. He asserted that Williams Gas had repeatedly violated the Gas Storage Lease for the past fifteen years.   In particular, Mr. Hawver cited the $5,000.00 installation deposit charge required by Williams Gas's November 4, 1998 letter as an unlawful condition for receiving free gas.   Mr. Hawver also notified Williams Gas of Mr. Cline's intent to drill for oil and gas at a depth below its leasehold.   Mr. Hawver followed up with a demand letter on April 16, 2003, informing Williams Gas that he had been retained by Mr. Cline because of its failure to supply free gas under the gas storage lease for the past fifteen years.  He again noted that Mr. Cline intended to drill on his property and that Mr. Cline considered the lease to be revoked.  On September 24, 2003, Mr. Hawver wrote to Southern Star, informing the company of Mr. Cline's intent to file suit unless Southern Star immediately connected its pipeline without any conditions or charges.   Mr. Hawver also stated that "[p]ursuant to the lease, it is clearly none of your concern whether Mr. Cline has easements, or other arrangements to get the gas to his house."   Mr. Cline filed this action on December 23, 2003.

### III.  DISCUSSION

#### A.  Statute of Limitations

Defendant first contends that all of Plaintiff's contract and tort claims are barred under the

applicable statute of limitations. "Where a suit invokes several causes of action, each is subject to a distinct statute of limitations; thus, distinct accrual periods should apply as to each cause of action." Tiberi v. Cigna Corp., 89 F.3d 1423, 1428 (10th Cir. 1996) (citing King v. Otasco, Inc., 861 F.2d 438, 441 (5th Cir. 1988)). "This is true even if the causes of action are derived from a single event." Id. Under Kansas law, a five-year statute of limitations applies to actions for breach of an agreement or a contract in writing. K.S.A. § 60-511(1). On the other hand, the statute of limitations is two years for claims of fraud, K.S.A. § 60-513(a)(3), conversion, K.S.A. § 60-513(a)(2), and intentional infliction of emotional distress, K.S.A. § 60-513(a)(4).

### 1. Breach of Contract Claim

Defendant asserts that Plaintiff's breach of contract claim is barred by the five-year statute of limitations period. "A cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes." Pizel v. Zuspann, 795 P.2d 42, 54 (Kan. 1990) (citation omitted); see also Johnson v. Kan. Pub. Employees Ret. Sys., 935 P.2d 1049, 1054 (Kan. 1997) (stating that "once a plaintiff realizes that a defendant has no intention of honoring an agreement, the cause of action accrues").

Defendant argues that if it breached the free gas provision contained in the Acknowledgment, the breach occurred in November 1978, when Cities Services initially informed Plaintiff that to obtain free gas, Plaintiff needed to construct a service line to Cities Services's pipeline and pay a connection fee to Cities Services. Defendant also points out that Plaintiff received letters dated September 13, 1978, October 3, 1988, November 2, 1988, and November

19, 1991, each reminding him of his responsibilities to obtain free gas more than a decade before

he filed this lawsuit.   The latest date Plaintiff could claim a breach, Defendant contends, was on

November 4, 1998, when Williams Natural returned Plaintiff's check for $368.38 and advised him

that it required a $5,000.00 deposit to connect.   Defendant notes that Plaintiff challenged the

$5,000.00 connection fee in a letter dated November 15, 1998, and thus, Plaintiff's response

indicates that he was aware of an alleged breach more than five years before he filed this lawsuit.

In response, Plaintiff relies on a continuing contract theory to save his contract claim.

Citing Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 174 F. Supp. 2d 1199 (D. Kan. 2001),

Plaintiff argues that under Kansas law, breach of contract actions accrue when payments are due

under the contract.   Under this concept, Plaintiff asserts that a breach of the Acknowledgment

occurred each time he requested free gas, which he claims is a form of rent under the terms of the

contract.   See Jackson v. Farmer, 594 P.2d 177, 182 (Kan. 1979) (quoting 3A WL Summers, The

Law of Oil and Gas § 571, at 4 (2d ed. 1958) ("'The covenant of the lessee to furnish free gas for

domestic heating and lighting may be technically called a rent.'").   Thus, Plaintiff states that a

separate cause of action for breach of contract accrued on December 10, 2002, and on September

24, 2003, when his attorney demanded free gas from Defendant and its predecessor in interest,

Williams Gas.

In Bagby, Judge Rogers observed that "a continuing contract concept does exist in Kansas

where a party is required to make payments pursuant to a contract."   174 F. Supp. 2d at 1203.[4]   He

---

[4]         Professor Corbin states the following about continuing contracts:

stated that "'[u]nder Kansas law, a cause of action for breach of an obligation to make payments under a continuing contract generally accrues at the time each payment becomes due, thus giving rise to a separate cause of action for each failure to make payment when due.'"  Id. (quoting Rupe v. Triton Oil & Gas Corp., 806 F. Supp. 1495, 1498 (D. Kan. 1992)); see Beltz v. Dings, 6 P.3d 424, 429 (Kan. Ct. App. 2000) (holding that a real estate contract for a term of thirty years was a continuing contract because it was not complete until the plaintiffs made their last payment and received the deed).  Judge Rogers determined that the theory applied only where the contract required continuing payments, but found no support for the theory "based solely upon a continuing contractual relationship."  174 F. Supp. 2d at 1203 (citations omitted).

The court would agree with Plaintiff's continuing contract theory if he were claiming that Defendant failed to pay him annual rental payments under the Gas Storage Lease or that Defendant failed to deliver his annual 300,000 cubic feet of free gas for any years between 1998 and 2003.

---

> Contracts to pay money or to deliver goods in instalments require a series of separate performances of measurable amounts at intervals of time.  Contracts to convey tracts of land or to render various kinds of service may also require performance in instalments at definite intervals; and the same rules should be followed in dealing with breaches and remedies therefor. There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made.  These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party.  For each "partial" breach a separate action is maintainable, just as in the case of an "installment contract"; and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

4A Arthur L. Corbin, Corbin on Contracts § 956, at 841 (1979).

But that is not the nature of Plaintiff's allegations.   Instead, Plaintiff claims that since 1978, Defendant and its predecessors have set up "obstacles" not contained in the Acknowledgment in order to deny him his free gas.   Plaintiff was well aware of the "obstacles" Defendant's predecessors set forth as far back as 1978.   In an attempt to give Plaintiff the benefit of the doubt, the court observes that Williams Gas notified Plaintiff in November 1998 that he would have to use a certified third party contractor to construct a service line and pay Williams Gas a $5,000.00 installation deposit for such facilities.   However, Plaintiff waited until December 2003 to file this action alleging that Defendant's "obstacles," including the $5,000.00 installation deposit, breached the Acknowledgment's provision for free gas.   To allow Plaintiff to claim that his cause of action is renewed every time he requested free gas from Defendant renders the five-year statute of limitations period meaningless.

## 2.  Tort Claims

Defendant also contends that Plaintiff's fraud, conversion, and intentional infliction of emotional distress claims are barred under the applicable two-year statute of limitations. "Generally, a cause of action accrues as soon as the right to maintain an action arises, i.e. when the plaintiff could have first filed and prosecuted the action to a successful completion. Clark Jewelers v. Satterthwaite, 662 P.2d 1301, 1304 (Kan. Ct. App. 1983) (citation omitted).  A claim based on fraud does not accrue "until the fraud is discovered."  K.S.A. § 60-513(a)(3).  "Under Kansas law, a fraud is discovered at the time of actual discovery or when, with reasonable diligence, the fraud could have been discovered."  Waite v. Adler, 716 P.2d 524, 527 (Kan. 1986). Second, "a cause of action in tort for conversion . . . accrues when substantial injury first appears

or when it becomes reasonably ascertainable."   Clark, 662 P.2d at 1304 (citation omitted); see

also K.S.A. § 60-513(b).   A substantial injury "means the victim must have sufficient ascertainable

injury to justify an action for recovery of the damages, regardless of extent."   Roe v. Diefendorf,

689 P.2d 855, 859 (Kan. 1984).   Finally, a claim for intentional infliction of emotional distress

accrues "on the date when the injury was incurred and the emotional impact was felt."   Moore v.

Luther, 291 F. Supp. 2d 1194, 1198-99 (D. Kan. 2003).             Once again, Plaintiff's theory is

that Defendant acted tortiously since his first request for free gas in 1978.   Defendant argues that,

at the latest, Plaintiff knew or should have known of its allegedly tortious conduct on November

4, 1998, when Williams Gas rejected Plaintiff's $368.38 check and informed him of the required

$5,000.00 deposit.   Similar to his contract claim, Plaintiff alleges that his tort claims fall within

the doctrine of continuing tort recognized in Kansas.   He states that his tort claims accrued on

December 10, 2002 and again on September 24, 2003, the last demand made by Plaintiff for free

gas.   At those times, Plaintiff argues that Defendant again failed to provide free gas based on a

pretextual, false excuse, causing Plaintiff's self-image to diminish and aggravating his post

traumatic stress disorder.

        Under the continuing tort doctrine, "'where a tort involves a continuing or repeated injury,

the cause of action accrues at, and limitations begin to run from, the date of the last injury.'"

Tiberi, 89 F.3d at 1430 (citation omitted); see also Hoery v. United States, 324 F.3d 1220, 1224

(10th Cir. 2003) (stating that "continuing torts do not avoid the statute of limitations; rather, such

torts remain timely not because the limitation period is tolled but because the cause of action

continues to accrue"); Cordon v. Trans World Airlines, Inc., 442 F. Supp. 1064, 1066 (D. Kan.

1977) ("Under Kansas law, where a cause of action is predicated on numerous acts occurring over an extended period, the cause of action accrues anew with each act, at least until the injury becomes permanent."). Nevertheless, "the doctrine cannot be employed where the plaintiff's injury is 'definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.'" Tiberi, 89 F.3d at 1430 (quoting Wilson v. Giesen, 956 F.2d 738, 743 (7th Cir. 1992)).

Plaintiff cites no authority for the proposition that Kansas would apply a continuing tort theory to his claims of fraud, conversion, or intentional infliction of emotional distress. Moreover, the court's research reveals that Kansas has only applied the theory in limited circumstances involving a continuing nuisance. Compare Dougan v. Rossville Drainage Dist., 15 P.3d 338, 345 (Kan. 2001) (nuisance and trespass), Bowen v. City of Kansas City, 646 P.2d 484, 487 (Kan. 1982) (nuisance), and Gowing v. McCandless, 547 P.2d 338, 342 (Kan. 1976) (nuisance), with Phillips USA, Inc. v. Allflex USA, Inc., 869 F. Supp. 842, 852-53 (D. Kan. 1994) (holding that Kansas would not apply a continuing tort theory to a tortious interference with contract claim), with Lockridge v. Tweco Prods., Inc., 497 P.2d 131, 134-38 (Kan. 1972) (determining that misappropriation of a trade secret is not a continuing tort).

Instead, Plaintiff cites to three Tenth Circuit opinions applying the continuing course of conduct doctrine. As Plaintiff's brief acknowledges, courts apply the doctrine to Title VII claims so that plaintiffs "may include incidents of unlawful acts outside the time period [for filing an administrative charge with the EEOC or a related state agency] if the various acts represent a 'continuing pattern of discrimination.'" Ratts v. Bd. of County Comm'rs, 141 F. Supp. 2d 1289,

1300 (D. Kan. 2001) (citing Furr v. AT&T Techs., Inc., 824 F.2d 1537, 1543 (10th Cir. 1987)). Using this rationale, Plaintiff contends that the doctrine applies because at least one incident of Defendant's failure to provide free gas due to a pretextual or fraudulent reason occurred within the limitations period.   Additionally, Plaintiff claims that Defendant's acts of "noncontract based false obstacles . . . are part of a continuing practice of denying . . . [P]laintiff the free gas he is entitled . . . ."

     The court, however, declines Plaintiff's apparent request to extend this doctrine beyond the context of Title VII.  See, e.g., Thomas v. Denny's, Inc., 111 F.3d 1506, 1514 (10th Cir. 1997) (stating that "the continuing violation theory is a creature of the need to file administrative charges, and because a section 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable); Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 984 (10th Cir. 1991) (gender discrimination claim); Furr, 824 F.2d at 1543 (age discrimination claim); Ratts, 141 F. Supp. 2d at 1300 (sexual harassment claim); Wallace v. Beech Aircraft Corp., 87 F. Supp. 2d 1138, 1146 n.6 (D. Kan. 2000) (age discrimination claim); Haug v. City of Topeka, Equip. Mgmt. Div., 13 F. Supp. 2d 1153, 1159 (D. Kan. 1998) (sexual harassment claim).

     As with Plaintiff's continuing contract theory, the court concludes that under the facts of this case, the continuing tort and continuing course of conduct doctrines would do little more than render the statute of limitations superfluous and allow Plaintiff to recover for a period when he unreasonably stood on his rights.   The doctrines are narrow concepts that must be limited to a distinct group of cases and are inapplicable to the case at bar.

Thus, the court concludes that Plaintiff's contract claim and tort claims are barred under the applicable statute of limitations.   Even assuming Plaintiff's claims are not time-barred, the court concludes, in the alternative, that Plaintiff's claims fail on their merits.   The necessity to analyze Plaintiff's claims arises, in part, from Defendant's quiet title and declaratory judgment counterclaims.

### B.  The Merits of Plaintiff's Claims

### 1.  Breach of Contract

Plaintiff claims that Defendant breached the Acknowledgment by failing to provide him free gas to his principal dwelling.   Plaintiff states that he first requested his free gas in 1978, but that Cities Service attempted to levy a $370.50 connection charge and required him to fill out numerous lengthy forms.   Plaintiff further contends that he made several requests for free gas over the next fifteen years, but that Defendant never placed a gas meter on its pipeline nearest to Plaintiff's property.[5]   In 1999, Plaintiff states that he made his final request for service, but that Defendant required him to pay a $5,000.00 installation deposit charge.   Plaintiff claims that Defendant imposed additional costs and requirements for free gas, such as the installation deposit charge, that are not contained in the Acknowledgment.   Plaintiff believes that Defendant should

---

[5]      As Defendant points out, this particular allegation comes from language in paragraph six of the Gas Storage Lease concerning free gas. The provision provides, in pertinent part that the lessee, "upon written request . . .[from the lessor] for gas, . . . shall within thirty (30) days after receipt of such request set or cause to be set a meter at its then nearest pipeline . . . ."   The problem with Plaintiff's contention is that the Acknowledgment's free gas provision expressly supersedes the free gas provisions in the Gas Storage Lease, and the Acknowledgment does not require Defendant to place a meter at its nearest pipeline upon written request of Plaintiff for free gas.

bear these additional costs and requirements because they were foreseeable.

Defendant argues that it is entitled to summary judgment because Plaintiff never satisfied the contractual conditions for receiving free domestic gas. Defendant asserts that the Acknowledgment requires Plaintiff to maintain the necessary service lines and appurtenances at his cost and expense and that Plaintiff's interpretation of the free gas issue is unreasonable and contrary to the Acknowledgment's plain terms. Defendant also points out that Plaintiff "sat on his hands" for several years, as evidenced by the time that passed between his communications with Defendant and its predecessors. To this day, Defendant maintains, Plaintiff does not have a well or pipeline on his property, making it impossible for him to receive his free gas until he constructs a service line from his home to Defendant's pipeline and makes a tap or physical connection to the pipeline. Moreover, while the Acknowledgment does not specify a dollar amount for the costs of laying and maintaining a service line and appurtenances, Defendant maintains that Plaintiff must pay the reasonable costs of making the connection from his property to Defendant's pipeline. The court concurs with Defendant.

"As a general rule, the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury." Steinle v. Knowles, 961 P.2d 1228, 1232 (Kan. 1998) (citing Fed. Land Bank of Wichita v. Krug, 856 P.2d 111, 114 (1993)). In the context of oil and gas leases, several familiar principles govern:

> the intent of the parties is the primary question; meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision;

> reasonable rather than unreasonable interpretations are favored; a practical and
> equitable construction must be given to ambiguous terms; and any ambiguities in a
> lease should be construed in favor of the lessor and against the lessee, since it is the
> lessee who usually provides the lease form or dictates the terms thereof.

Jackson v. Farmer, 594 P.2d 177, 188 (Kan. 1979) (construing a free gas provision in an oil and

gas lease); see also Richardson v. N.W. Cent. Pipeline Corp., 740 P.2d 1083, 1086-87 (Kan.

1987) (same).   Finally, to establish a breach of contract claim in Kansas, Plaintiff must prove the

following five elements:   "(1) the existence of a contract between the parties; (2) consideration;

(3) the plaintiff's performance or willingness to perform in compliance with the contract; (4)

defendant's breach of the contract; and (5) that plaintiff was damaged by the breach."   Britvic Soft

Drinks Ltd. v. Acsis Techs., Inc., 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

       The court concludes that Plaintiff's breach of contract claim is without merit because he

failed to perform in compliance with the Acknowledgment.   The Acknowledgment controls the

duties and responsibilities of each party pertaining to free gas.[6]   The agreement clearly provides

that the lessor must "lay and maintain in good condition the necessary service lines and

appurtenances to receive and utilize the gas so delivered, all at [the lessor's] sole cost, risk and

expense . . . ."   In return, the lessee will deliver 300,000 cubic feet of free gas per year to the

lessor's principal dwelling for domestic use, and charge the lessor fifty cents per thousand cubic

feet for gas used in excess of 300,000 cubic feet.   The measurement and point of delivery of the

---

[6]       The Acknowledgment specifically states that the covenants to furnish gas contained in the
Gas Storage Lease are substituted for the covenants to furnish gas in the Acknowledgment, and that
upon execution of the Acknowledgment, the Gas Storage Lease's provisions for free gas "become
null and void."

gas is to occur at the lessee's meter, pursuant "to the [lessee's] regular measuring and accounting procedures and rules and regulations . . . pertaining to the sale of gas."

The uncontroverted evidence demonstrates that Plaintiff did not satisfy his responsibilities to connect to Defendant's pipeline, which would have triggered Defendant's obligation to provide him free gas. See Arnold v. S.J.L. of Kan. Corp., 822 P.2d 64, 68 (citations omitted) (stating that "if a contract contains a condition precedent the condition must occur or be performed before the contract takes effect and is enforceable") 3A WL Summers, The Law of Oil and Gas § 587, at 100 (2d ed. 1958) ("A lessor cannot establish a breach of the covenant to furnish free gas where the lease places the responsibility of making the connection to the well on the lessor at his risk and expense, and it is his own failure to make proper connection with the well that makes the gas unavailable to him."); 3 Williams & Meyers, Oil and Gas Law § 661, at 754 (1986) ("Almost invariably the free gas clause provides that the connection with the well shall be at the risk and expense of the lessor.  If the lessor does not install the proper equipment to make the well serviceable for domestic purposes, he may not complain of breach of the free gas covenant.").

Plaintiff initially requested free gas in 1978, and Cities Service applied for and received the necessary authorization from the Federal Energy Regulatory Commission to provide service to Plaintiff's residence.   Cities Service also informed Plaintiff that he would need to sign an "Application for Transportation Line Connection," pay a connection charge of $370.50, and install a service line from his residence to its pipeline.  Despite this information, Plaintiff did not act on the free gas provision until 1988, when he asked Williams Natural if it would still be possible to connect to its pipeline.   Williams Natural again told Plaintiff he would need to fill out an

application, pay a connection charge of $364.00, and install a service line at his expense. Williams Natural provided Plaintiff the same information in response to his requests for free gas in November 1991. It was not until October 1998 that Plaintiff sent Williams Natural a check for $368.38, and signed the "Application for Transportation Line Connection." A letter from Williams Gas on November 4, 1998, indicates that Plaintiff still did not have the facilities on his property to make a connection to its pipeline, nor the necessary easements to cross his neighbor's land with a service line. Additionally, Williams Gas informed Plaintiff that in 1991 it required homeowners to be responsible for construction of their own service lines, but due to governmental safety regulations, Williams Gas now required a third party contractor to construct the service line as the customer's expense. Thus, Williams Gas required a $5,000.00 installation deposit charge to construct the service line and install the metering facilities.

Plaintiff complains that Defendant breached its obligation to provide free gas by requiring Plaintiff to pay the $5,000.00 installation deposit charge and to fill out paperwork. But what Plaintiff characterizes as obstacles are simply the requirements the Acknowledgment imposed on the lessor to acquire free gas. It was Plaintiff's own decision, financial or otherwise, not to have a service line constructed on his property. In 1998, Williams Gas required Plaintiff to use a thirty party contractor approved by the Department of Transportation to construct the necessary facilities. Even before this time, it was still Plaintiff's responsibility to pay for the costs and expenses of the service line and any appurtenances. Thus, Defendant and its predecessors never imposed any unforeseeable, additional costs.

The terms of the Acknowledgment are not ambiguous. See Richardson, 740 P.2d at 1087

24

(stating that "the language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense that the contract may be understood to reach two or more possible meanings").  As a condition precedent to receiving free gas, Plaintiff must bear, on his own, all the costs and expenses of installing the service line and any appurtenances in order to make a connection to Defendant's pipeline.  Defendant's requirements are reasonable and consistent with the plain terms of the Acknowledgment and the intent of the original parties.  While the Acknowledgment does not specify the amount of these costs and expenses, the court concludes that Defendant is entitled to the actual costs from Plaintiff for constructing the service line, metering facilities, and connection tap.  The court also concludes that filling out Defendant's standard application form and paying its connection charge fee are part of the costs and expenses the lessor assumed under the Acknowledgment.  Plaintiff is entitled to 300,000 cubic feet of free gas for the domestic requirements of his principal dwelling, and he only has to pay fifty cents per thousand cubic feet beyond that amount.  See Richardson, 740 P.2d at 1088 (concluding that under a similar free gas provision that the parties intended to furnish free gas to the lessors "for domestic use only at the principal dwelling house on the premises"); Rinehart v. N. Natural Gas Co., 967 P.2d 1090, 1091 (Kan. Ct. App. 1998) (holding that the language "for domestic purposes only" in a gas pipeline easement "does not make gas available for irrigation or agricultural purposes" because "'domestic use'" language in free or cheap gas clauses . . . generally . . . mean[s] for use in the principal dwelling on the property").  In all other respects, Plaintiff is subject to Defendant's standard rules and regulations like any of its regular customers.

Accordingly, for these additional reasons, Defendant is entitled to summary judgment as to Plaintiff's breach of contract claim.

## 2. Fraud

Plaintiff's second claim is that he suffered injuries independent from the breach of the free gas provision contained in the Acknowledgment. Plaintiff alleges that Defendant prevented him from obtaining free gas under the Acknowledgment based on pretextual, false reasons and obstructions that amounted to fraud. Plaintiff alleges in the pretrial order that Defendant

> intentionally and overtly violated the plain terms of the lease documents, in that . . . by trick, fraud, and artifice, [Defendant] failed and refused to set a gas meter for Plaintiff's use and benefit as set out in the lease documents, despite his written requests that [Defendant] do so, thus depriving Plaintiff of 300,000 cubic feet of natural gas annually since 1978, when he made his first unsuccessful request for gas service.

Plaintiff explains that, by trick, Defendant made him believe that it would provide him his contracted for natural gas if he would jump "through an indeterminate number of constantly changing hoops." Plaintiff cites Defendant's requested connection fees and "other pretextual conditions for 'safety'" as additional duties and costs not mentioned in the Acknowledgment. In short, Plaintiff alleges that Defendant never intended to supply him free gas, and that he relied on the false reasons stated by Defendant and its predecessors for not furnishing him the gas.

Defendant responds that any fraud claim Plaintiff may possess sounds in contract, not tort. Defendant asserts that the parties' relationship is entirely contractual, and that Plaintiff may not assert a tort claim covering the same subject matter governed by the Gas Storage Lease and Acknowledgment. The court agrees. "Kansas courts and the Tenth Circuit have consistently

26

refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts." Foodbrands Supply Chain Servs. Inc. v. Terracon Inc., No. 02-2504-CM, 2003 WL 23484633, at *6 (D. Kan. Dec. 8, 2003). (citations omitted).   "[W]hen parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract no matter what words the plaintiff may wish to use in describing it." Beeson v. Erickson, 917 P.2d 901, 907 (Kan. Ct. App. 1996).  But see Bittel v. Farm Credit Servs. of Cent. Kan., P.C.A., 962 P.2d 491, 498 (Kan. 1998) (determining that "when the same conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies").   While Plaintiff claims that Defendant's refusal to provide him free gas under his interpretation of the contract amounts to fraud, the court concludes that Plaintiff's claims arise solely under contract. In any event, Plaintiff's fraud claim fails because he cannot prove that Defendant made a false statement of material fact.   As explained above, Defendant's requirements for Plaintiff to receive free gas are consistent with the Acknowledgment.

Accordingly, for these additional reasons, the court grants Defendant's motion for summary judgment as to Plaintiff's fraud claim.

### 3.  Intentional Infliction of Emotional Distress

Third, Plaintiff claims that Defendant's pattern and practice of refusing to supply free gas to him aggravated his preexisting post-traumatic stress disorder ("PTSD").   Plaintiff is a disabled Vietnam combat veteran who suffers from PTSD.   As a result of the "repeated paper chase" required by Defendant to obtain his free gas, Plaintiff claims that Defendant exacerbated his PTSD

27

and increased his symptoms of helplessness, anger and depression.

To state a claim of intentional infliction of emotional distress in Kansas, the court must determine whether Plaintiff satisfies two threshold requirements. <u>Roberts v. Saylor</u>, 637 P.2d 1175, 1179 (Kan. 1981).  First, Plaintiff must demonstrate that Defendant's alleged conduct was "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." <u>Id.</u>  Second, Plaintiff must establish that his emotional distress "is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." <u>Id.</u> (citations omitted).

The court concludes that Plaintiff's intentional infliction of emotional distress claim is insufficient as a matter of law.  Defendant merely informed Plaintiff of the necessary steps to obtain free gas, and Plaintiff disagreed with those terms and conditions.  Defendant's conduct does not satisfy the outrageous and extreme conduct required under Kansas law.

### 4.  Conversion

Finally, Plaintiff claims that Defendant and its predecessors converted natural gas "produced by the petroleum deposits on Plaintiff's property which commingled with Defendant's stored natural gas."  Plaintiff states that he has consulted with geologists and petroleum experts and they have informed him that his property "had in the past produced natural gas and oil."  Plaintiff alleges that Defendant has injected natural gas into the gas producing areas underneath his property, commingling Defendant's stored gas with his gas.  Furthermore, Plaintiff alleges that Defendant "has asserted ownership over layers of gas and oil producing formations excluded from

its lease and has stopped the plaintiff from utilizing his own gas and oil, even though the lease provisions expressly state that the landowner has every right to drill for oil on the leasehold property."   In response, Defendant argues that it is entitled to summary judgment on this claim because the record lacks any evidence that it produced natural gas owned by Plaintiff or that there is any recoverable gas underneath Plaintiff's property besides its stored gas.

The court questions whether Plaintiff properly alleged a claim for conversion.   Plaintiff's original complaint set forth three counts for breach of contract, fraud, and intentional infliction of emotional distress.   In the complaint's statement of damages, Plaintiff did allege damages as a result of Defendant's conversion of Plaintiff's natural gas.   Moreover, the pre-trial order, which expressly "supercedes all pleadings and control[s] the subsequent course" of the case, only lists three theories of recovery for breach of contract, fraud, and intentional infliction of emotional distress.   In the "Factual Contentions" section of the pre-trial order, however, Plaintiff does make the allegations of conversion summarized above.   Even giving Plaintiff the benefit of the doubt, his allegations of conversion are without merit.

Under Kansas law, conversion is the "unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."   Gillespie v. Seymour, 796 P.2d 1060, 1066 (Kan. Ct. App. 1990) (citing Moore v. State Bank of Burden, 729 P.2d 1205, 1210 (Kan. 1986)).   To state a claim for conversion under Kansas law, a plaintiff must allege that he has been deprived of the use of his property.   See United Phosphorus Ltd. v. Midland Fumigant, Inc., No. 91-2133-EEO, 1995 WL 646818, at *2 (D. Kan. Oct. 13, 1995); Indep. Drug Wholesalers Group, Inc. v. Denton, 833 F. Supp. 1507, 1522 (D. Kan.

1993).

In his response brief, Plaintiff relies exclusively on the deposition testimony of Stephen Miller to support his conversion allegations. Mr. Miller holds a bachelor of science degree in geology and has been employed as an independent petroleum consultant for twenty-four years. As part of his consultant duties, Mr. Miller prospects, or searches for oil and gas. He researches well information, supervises the drilling and completion of wells, and evaluates proven and unproven leases for their value.

Ironically, Mr. Miller's testimony is contrary to Plaintiff's assertions, as Mr. Miller testified in deposition that to the extent there is active gas still under Plaintiff's property, it is not commingled with Defendant's storage gas because it is in other sands. Moreover, Mr. Miller testified that he did not do a specific investigation of Plaintiff's property and that he has not determined what volume of oil may remain there. Instead, he looked at the Kansas Geological Survey on a website to determine the well locations in the area and to see what information was available on those wells. He described the information available as very limited. To his knowledge, there were no gas wells or producing oil wells on Plaintiff's property. His conclusions about oil reserves related to McLouth Storage Field as a whole, and are based on oil production on properties other than Plaintiff's. He further stated that there may be some natural gas potential in some coal seams in certain areas of the McLouth Storage Field, but that he had not identified specifically where those coals seams are. Finally, Mr. Miller testified that he had not even reviewed the Gas Storage Lease covering Plaintiff's property. Because Plaintiff's allegations

are not supported with evidence in the record, the court grants summary judgment as to this claim.[7]

C.  Defendant's Counterclaims

1.  Quiet Title

Defendant's first counterclaim seeks a judgment quieting title in its oil, gas, and mineral interests underneath Plaintiff's property.  Defendant asks the court to specifically quiet title

> to all natural gas injected into the Storage Zone by Southern Star, to any other natural gas, oil or other minerals under the Subject Property (other than a potential royalty interest in minerals that might be produced in the future by Southern Star, if any, from greater than twenty feet (20') below the top of the Mississippi Lime) and to any wells, pipelines or other property that Southern Star has placed on the Subject Property.

Defendant's request to quiet title appears to stem from Plaintiff's conversion claim, as well as Plaintiff's alleged threats to enter another oil and gas lease so that an operator can begin producing oil and gas from Plaintiff's property.  The record does indicate that Plaintiff has communicated such intentions to Defendant and its predecessors.  For example, a letter dated December 10, 2002, from Plaintiff's counsel to Williams Gas states:  "Pursuant to paragraph 9 of the [Gas Storage] [L]ease, Mr. Cline hereby notifies you of his intent to drill for oil production at any depth and possibly for gas production below your leasehold.  As a courtesy . . . Mr. Cline will notify you prior to the initiation of drilling operations."  Furthermore, a letter dated April 16, 2003, from Plaintiff's counsel to Williams Gas provides that Plaintiff intends to drill on his

---

[7]       Paragraph seven of the Gas Storage Lease also rebuts Plaintiff's conversion claim.  That provision states that Plaintiff's property does not possess a producing gas well.  Moreover, it states that the original parties measured the amount of gas underneath Plaintiff's property, and agreed "that there was on June 23, 1944 no cubit feet there . . . ."

31

property pursuant to the Gas Storage Lease provisions.

Defendant maintains that it has the exclusive right to explore and produce the oil, gas and other minerals underneath Plaintiff's property pursuant to the Oil and Gas Lease. Moreover, Defendant correctly points out that pursuant to paragraphs fourteen and fourteen "A" of the Gas Storage Lease, the Oil and Gas Lease remains valid so long as the Gas Storage Lease is in good standing. It is uncontroverted that Defendant has tendered all annual rental payments under the Gas Storage Lease and continues to store gas underneath Plaintiff's property. As a result, both the Gas Storage Lease and Oil and Gas Lease remain valid.

At this time, however, the court declines to hold that Plaintiff does not possess any oil or gas rights to convey or lease. First, neither party has provided the court with a legible copy of the Oil and Gas Lease to examine. While Plaintiff did not controvert the rights Defendant claimed that the Oil and Gas Lease conveyed, Defendant still carries the burden to provide the court with evidence for its counterclaim. Second, neither party has explained the significance of paragraph nine of the Gas Storage Lease, which Plaintiff's attorney relied upon in his December 10, 2002 letter. That paragraph provides:

> [The lessor] reserves all oil rights below the surface and all gas rights pertaining to gas which may be found in formations lying below twenty feet (20') below the top of the Mississippi Lime but [the lessor] agrees that in the development of such reserved rights and minerals, either directly or by lease to others, First Party shall do all things necessary to adequately protect [the lessee's] storage formations, and agrees to use such methods as may be deemed a necessity by [the lessee].

Paragraph nine may affirm Plaintiff's royalty interests to any oil and gas developed in certain depths underneath his property, and may be consistent with Defendant's claimed rights to mine and

drill for such oil and gas under the Oil and Gas Lease.   However, the court will not make this presumption.  Accordingly, Defendant's quiet title counterclaim is denied.

### 2.  Declaratory Judgment

Defendant next requests a judgment "declaring that Southern Star's gas storage lease remains valid, that Southern Star has not breached its agreement with Plaintiff, and declaring the terms and conditions Plaintiff must satisfy in order to receive 'free gas' in the future."

Plaintiff asserts that Defendant is not entitled to a judgment declaring that the Gas Storage Lease remains valid because he lawfully voided the Gas Storage Lease years ago because of Defendant's failure to perform as required under the terms of the lease.   Specifically, Plaintiff's response brief states that Defendant does not have "clean hands" because it "denied the plaintiff benefits it [sic] clearly was entitled to and use[d] demonstrably false reasons to deceive the plaintiff."   Plaintiff's argument is not well conceived.   Plaintiff's attorney's letter to Williams Gas, dated April 16, 2003, does state that "Mr. Cline considers Gas Storage Lease #32280 to be revoked and no longer in effect . . . ."   Plaintiff, however, fails to cite to the court a provision of the Gas Storage Lease that gives him the unilateral right of revocation.   It is uncontroverted that Defendant and its predecessors have tendered all annual rental payments owed under the Gas Storage Lease and that Defendant is currently storing gas and conducting gas storage operations underneath Plaintiff's property.   Moreover, in 1996, Plaintiff dismissed his lawsuit against Williams Natural, stating that the Gas Storage Lease remained in full force and effect.   Plaintiff has not provided the court with any evidence contrary to that position.

As to the last two requests for declaratory judgment, the court has already discussed in this

memorandum and order whether Defendant breached the free gas provision in the Acknowledgment and concluded that the conditions Defendant communicated to Plaintiff in order to receive his free gas were reasonable and consistent with the Acknowledgment's plain terms and the intent of the original parties.  It is unnecessary to repeat that analysis again.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendant's motion for summary judgment (Doc. 46) is granted in part and denied in part.  Specifically, the court grants Defendant summary judgment as to all of Plaintiff's claims and Defendant's declaratory judgment counterclaim, but denies summary judgment as to Defendant's quiet title counterclaim.

Copies of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**

Dated at Kansas City, Kansas, this 18th day of February 2005.

/s/ G.T. VanBebber
G. Thomas VanBebber
United States Senior District Judge